## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KATHY L. SLADEK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 C 1282 |
| v. | ) | |
| | ) | |
| LOUIS DEJOY, United States | ) | Judge Thomas M. Durkin |
| Postmaster General, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kathy L. Sladek, who is white, brings this *pro se* action against the United States Postmaster General (the "Postmaster"), alleging constructive discharge and race, color and sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* in connection with her placement on a less desirable shift and subsequent retirement from the United States Postal Service ("USPS"). The Postmaster moved for summary judgment. R. 32. For the following reasons, that motion is granted.

### Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To

defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### Local Rule 56.1

At the outset, the Postmaster points to technical failures by Ms. Sladek to comply with Local Rule 56.1 in responding to its motion. Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts comprised of short numbered paragraphs with citations to admissible evidence. L.R. 56.1(a)(3). The nonmovant then must respond, first by setting forth the text of the movant's asserted fact, and then admitting or denying that fact, providing citations to "specific references to the affidavits, parts of the record, and other supporting materials relied upon" in the case of any disagreement. L.R. 56.1(e); L.R. 56.1(b)(3)(B). If the nonmovant fails to controvert the movant's facts in this manner, the facts may be deemed admitted. L.R. 56.1(b)(3)(C); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). The nonmovant also may submit a statement of additional facts, the obligations for which are "identical to the obligations imposed on the movant's statement of facts." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000); L.R. 56.1(b)(3)(C). Courts are entitled to expect "strict compliance" with Local Rule 56.1,

"even of *pro se* litigants." *See Pytell v. Bradley*, 2010 WL 5110138, at *2 (N.D. Ill. Dec. 7, 2010).

The Postmaster served Ms. Sladek with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as Local Rule 56.2 requires. R. 36. This notice explained how to respond to the Postmaster's motion and Rule 56.1 Statement and cautioned Ms. Sladek that the Court would deem the Postmaster's factual contentions admitted if she failed to follow those procedures. *Id.* But the Postmaster argues that Ms. Sladek did not do so, because she: (1) did not restate the paragraphs in the Postmaster's Local Rule 56.1(a) statement before responding to them; (2) included argument and characterization of evidence in her Local Rule 56.1 response; and (3) failed to file a statement of additional material facts explaining whether and if so how the declaration and other exhibits she submitted raise facts that preclude summary judgment. The Postmaster urges the Court to deem his facts admitted. R. 43 at 3.

The Court declines the invitation. It is always the Court's preference to resolve cases on their merits. And *pro se* filings are to be liberally construed. Further, many attorneys unwittingly violate Local Rule 56.1, and Ms. Sladek has made a good faith effort to comply. In short, the factual issues in this case are not complex, the evidentiary record is not lengthy, and Ms. Sladek's noncompliance has not interfered with the Court's ability to discern the disputed from the undisputed facts. Accordingly, the Court will consider the Postmaster's Local Rule 56.1 statement along with Ms. Sladek's responses thereto and the record itself to resolve this motion. *See Boykin v. Dart*, 2014 WL 5611466, at *6 (N.D. Ill. Nov. 4, 2014) ("Although the Court

3

is entitled to demand strict compliance with Local Rule 56.1, it ordinarily affords *pro se* plaintiffs significant leeway in responding to summary judgment filings."). The Court now turns to the facts, which are undisputed unless otherwise noted.

## Background

Ms. Sladek began working for USPS in 1974. R. 35 ¶ 1; R. 41 ¶ 1. She was promoted ten years later to mail flow controller at the Chicago Bulk Mail Center (the "Facility") in Forest Park, Illinois—a position she held until she left USPS in 2010. R. 35 ¶ 2; R. 41 ¶ 2. As a mail flow controller, Ms. Sladek was considered a non-union management-level employee, and was responsible for monitoring the flow of packages and sacks of packages or bulk mail transported on conveyor belts. R. 35 ¶¶ 3-4; R. 41 ¶¶ 3-4. In the early to mid-1990s, Ms. Sladek bid on and was assigned to a mail flow controller position on Tour 2, a shift that began at approximately 4:30 a.m. and ended at about 1:00 p.m. R. 35 ¶ 5; 41 ¶ 5. She remained on Tour 2 for years, but she also was temporarily assigned to work in various other positions and on other tours. R. 35 ¶ 6; R. 41 ¶ 6.

In March 2009, Ms. Sladek was assigned to work as a mail flow coordinator on Tour 1 at her request by lead manager of distribution operations Melvin Smith. R. 35-1, Ex. 1 at 20-21. That shift began at approximately 12:30 a.m. and ended at approximately 8:30 a.m. R. 35 ¶ 7; R. 41 ¶ 7. But while Ms. Sladek contends the reassignment was permanent, the Postmaster says that it was temporary.

In any case, with the exception of brief periods during which Ms. Sladek was temporarily assigned to various other positions that also were on Tour 1 (working

roughly the same overnight hours), or in some cases on Tour 2 (working from 7:00 a.m. to 3:30 p.m.), it is undisputed that Ms. Sladek worked as Tour 1's only mail flow controller until April 2010. R. 35 ¶¶ 7-13; R. 41 ¶¶ 7-13; R. 40 at 1. That month, the Postmaster contends that the mail processing equipment and parcel and sack mail operations were shut down on Tour 1, and many employees working that shift were excessed or transferred to other facilities. R. 35 ¶ 14; R. 41 ¶ 14. Ms. Sladek's manager, Cynthia Evans, directed her to return to her Tour 2 mail flow controller assignment as a result. R. 35 ¶ 15; R. 41 ¶ 15.

In response, Ms. Sladek, who had been considering retirement as early as January 2011, told Ms. Evans that she may need to retire sooner if she was not given work hours that would permit her to be home from 2:00 p.m. to 6:00 p.m. to care for her ailing husband. R. 35 ¶¶ 16, 17. Ms. Evans told Ms. Sladek that she did not need to retire, and that she might work with Ms. Sladek on scheduling issues later (including if mail processing were to resume on Tour 1), but at this time she was short on mail flow controllers on Tour 2 and needed Ms. Sladek's help. *Id.* ¶¶ 16-18. Ms. Sladek thereafter went on leave and applied for retirement a month later. *Id.* ¶ 19. She remained on payroll until her retirement became effective on July 30, 2010. *Id.*

Meanwhile, Ms. Sladek sought EEO counseling and thereafter filed an administrative complaint alleging that she was discriminated against based on her race and color when her "midnight shift" was cancelled and she was told to report to the day shift, claiming she had been forced into early retirement. R. 35 ¶¶ 20-21; R. 41 ¶¶ 20-21. Ms. Sladek's administrative complaint suffered through a lengthy and

somewhat complicated procedural history before she ultimately sought to amend it nearly six years after filing to include a sex discrimination claim and a claim under the Americans with Disabilities Act. R. 35 ¶ 31; R. 41 ¶ 31. The EEOC administrative judge denied that request as untimely and unduly prejudicial. *Id.*

Ms. Sladek thereafter withdrew her hearing request, and in August 2016 USPS issued a final agency decision concluding that Ms. Sladek had failed to sustain a *prima facie* case because she had not presented evidence that comparable employees outside of her race and color were treated more favorably, and noting that Ms. Sladek admitted that she was unaware of any other employee who did not have his or her shift or tour changed in 2010 by the same manager she claims discriminated against her. R. 35 ¶¶ 32-33; R. 41 ¶¶ 32-33. USPS also concluded that Ms. Sladek could not support her constructive discharge claim because she had failed to present evidence that her workplace was so intolerable that she was forced to retire, noting that Ms. Sladek herself said her supervisor told her not to. R. 35 ¶ 34; R. 41 ¶ 34. Ms. Sladek appealed to the Office of Federal Operations of the EEOC, which affirmed the final agency decision in November 2018. R. 35 ¶ 35; R. 41 ¶ 35. Her appeal did not challenge the administrative judge's denial of her request to add sex and disability claims. *Id.*

Ms. Sladek thereafter filed this lawsuit, alleging discrimination based on her sex, race, and color, and that she was constructively discharged. R. 1; R. 8. The Postmaster now moves for summary judgment on all claims.

## Analysis

### I.     Sex Discrimination

At the outset, the Postmaster contends that Ms. Sladek cannot proceed on her sex discrimination claim because she failed to administratively exhaust it. Ms. Sladek made no argument in response and in fact concedes that she did not appeal the EEOC administrative law judge's denial of her request to add such a claim. R. 41 ¶ 35. Accordingly, summary judgment is proper on this claim. *See De v. City of Chi.*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012) ("Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of [her] claims.") (citing *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003)); *see also Green v. Brennan*, 136 S. Ct. 1769, 1775 (2016) ("Before a federal civil servant can sue his employer in court for discriminating against him in violation of Title VII, he must first exhaust his administrative remedies.") (citing 42 U.S.C. § 2000e–16(c)).[1]

### II.    Race and Color Discrimination

The Postmaster does not dispute that Ms. Sladek exhausted her race and color discrimination claims, but argues that summary judgment is proper on the merits. Under *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), a Title VII

---

[1] The Postmaster also argues that summary judgment is proper on Ms. Sladek's age discrimination claim. The Court reviewed the various iterations of Ms. Sladek's complaint and saw no mention of age discrimination. There is no evidence that Ms. Sladek ever raised a claim of age discrimination before this lawsuit, either. But even if she had, summary judgment would be proper for the same reasons it is as to Ms. Sladek's sex discrimination claim—that is, based on waiver and failure to exhaust.

discrimination plaintiff survives summary judgment if she presents evidence that, "considered as a whole," would allow a reasonable jury to find that her protected characteristic caused the adverse employment action about which she complains. One way in which a plaintiff can proceed is through the *McDonnell Douglas* burden-shifting framework, under which she first must establish a prima facie case of discrimination, the employer then presents evidence of a non-discriminatory reason for its decision, and the burden ultimately shifts back to the plaintiff to establish that the employer's reason is pretextual. *See Volling v. Kurtz Paramed. Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (*McDonnell Douglas* is a "common, but not exclusive" method to establish a "triable issue of intentional discrimination"). But ultimately and regardless of the method used, all evidence is placed "in a single pile," and the question "is simply whether the evidence would permit a reasonable factfinder to conclude that [the plaintiff's] race . . . or [color] caused" the adverse employment action. *Ortiz*, 834 F.3d at 765-66.

The Postmaster analyzes the evidence under *McDonnell Douglas*. Accordingly, the Court begins there before "assess[ing] cumulatively all the evidence." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

### A.    *McDonnell Douglas*

The *McDonnell Douglas* framework requires a plaintiff alleging unlawful discrimination to first present evidence that: (1) she belonged to a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees who were not white were

treated more favorably. *Moultrie v. Penn Aluminum Int'l, LLC*, 766 F.3d 747, 753 (7th Cir. 2014). The Postmaster contends that Ms. Sladek failed to establish both that she suffered an adverse employment action, and that there were similarly situated employees who were not white and were treated more favorably. The Court considers these arguments in turn before addressing pretext.

*Adverse employment action.* The Postmaster argues at the outset that USPS simply removed her from her temporary assignment and returned her to her permanent post, which cannot be an adverse employment action. But Ms. Sladek contests that with her own deposition testimony, in which she explained her understanding that the assignment in March 2009 to Tour 1 was permanent. *See* R. 35-1 at 16 (Ms. Sladek deposition in which she testifies that April 29, 2009 was "just maybe a month after I was officially moved and not detailed to Tour 1"); *see also id.* at 10 (Ms. Sladek deposition testimony in response to the question "[Y]ou were detailed to Tour 1, is that correct?" that "No, I was assigned to Tour 1."). A mere change in an employee's work schedule is not, by itself, an adverse employment action. *See Porter v. City of Chi.*, 700 F.3d 944, 954-955 (7th Cir. 2012) (citing *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001)). And that makes sense, because to be actionable, the event complained of must be "more disruptive than a mere inconvenience." *Id.* at 954 (quoting *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009)). But in *Washington v. Illinois Department of Revenue*, the Seventh Circuit held that a jury could find that a change to an employee's work schedule *was* actionable—at least for purposes of a retaliation claim. 420 F.3d 658,

9

663 (7th Cir. 2005). The court's analysis rested on: (1) evidence suggesting that the employer made the change to exploit a "known vulnerability"—that is, the employee's need to work a flexible schedule to care for her special needs son; and (2) the fact that the employee had to use vacation and sick leave to meet those needs. *Id.* at 662-63.

It is undisputed that Ms. Sladek's manager, Ms. Evans, was aware that working Tour 1 allowed Ms. Sladek to arrange care for her ailing husband between herself and her sons without the need for outside help. Accordingly, and drawing all reasonable inferences in favor of Ms. Sladek as required, the Court declines to grant summary judgment to the Postmaster on this basis. *Compare Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 650 (7th Cir. 2011) (affirming summary judgment for employer in part because plaintiff did not argue before the district court that "family considerations" made the shift change materially adverse for him).

***Similarly situated employees.*** The Postmaster next contends that Ms. Sladek failed to identify any similarly situated employee who was treated better than she was and is not white. "Whether a comparator is similarly situated is typically a question for the fact finder, unless . . . the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden" on the issue. *Johnson*, 892 F.3d at 895. A similarly situated employee generally is "'directly comparable' to the plaintiff 'in all material respects,'" *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368-69 (7th Cir. 2019), such that he or she "(1) 'dealt with the same supervisor,' (2) 'w[as] subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would

10

distinguish their conduct or the employer's treatment of them,'" *Coleman v. Donahue*, 667 F.3d 835, 847 (7th Cir. 2012) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)). But "there is no magic to these considerations," and "the requirement to find a similarly situated comparator is really just the same requirement that any case demands—the requirement to submit relevant evidence." *Johnson*, 892 F.3d at 895.

The Postmaster contends that there is no similarly situated employee, because all seven mail flow controllers at the Facility suffered some schedule change during the relevant period. But he also acknowledges that Ms. Sladek was the only white mail flow controller, and that her schedule change was the most dramatic, since only she was removed completely from her preferred shift, while the others experienced only minor changes to their start and end times. Nevertheless, it is undisputed that Ms. Sladek was the *only* mail flow coordinator assigned to Tour 1 during the relevant period. And the Postmaster argues that there was a legitimate reason for her differing treatment; that is, that there was no longer a need for a dedicated mail flow controller on Tour 1, because mail flow operations had ceased during those hours. This contention and Ms. Sladek's arguments in response dovetail with the Court's pretext analysis, to which it now turns.

***Pretext.*** To show pretext, Ms. Sladek must demonstrate that the Postmaster was "dishonest rather than simply foolish or unreasonable." *Schmitt v. Cent. Processing Corp.*, 675 Fed. App'x 615, 620 (7th Cir. 2017). And she must point to "some circumstances to support an inference that there was an improper motivation

proscribed by law." *Tyburski v. City of Chi.*, 964 F.3d 590, 599 (7th Cir. 2020) (quoting *Benuzzi v. Bd. of Educ. of the City of Chi.*, 647 F.3d 652, 663 (7th Cir. 2011)).

Ms. Sladek's principal argument for pretext is that Ms. Evans gave two differing explanations for her removal from Tour 1; specifically, that Ms. Evans initially told her that she needed to return to Tour 2 because that shift was short on mail flow controllers, and then later that mail flow controllers were no longer needed on Tour 1. Ms. Sladek is correct that shifting explanations can support an inference of pretext. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015) ("a reasonable trier of fact can infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision). But while the two explanations here differ, "they are not mutually exclusive." *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 631 (7th Cir. 2018); *see also Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) (explanation "must actually be shifting and inconsistent to permit an inference of mendacity"). Indeed, "[b]oth can be true without violating the principle of non-contradiction."[2] *Barbera*, 906 F.3d at 631. Thus, the explanations themselves are insufficient to fend off summary judgment.

Ms. Sladek next argues that there was no need for mail controllers on Tour 2 as Ms. Evans stated, presenting evidence that mail flow controllers assigned to Tour 2 while she was assigned to Tour 1 were being utilized temporarily in other positions. But it is undisputed that other Tour 2 mail flow controllers worked *overtime* to

---

[2] This is so because if Tour 1 was no longer running, it follows that by comparison Tour 2 had a greater need for mail flow controllers.

complete the work from their assigned shifts. And the fact that some mail flow controllers were assigned to other work at most suggests that there was a need in those roles, too.

Ms. Sladek also contends that the Postmaster should have returned those mail flow controllers assigned to Tour 2 and temporarily assigned to other positions to their mail flow controller work on Tour 2 instead of removing her from her Tour 1 posting. She contends that she was the most senior of the mail flow controllers, and therefore should have been the last affected by any schedule change. But this argument fails for at least two reasons. First, there is no evidence that the Postmaster was obligated to place a non-bargaining unit employee like Ms. Sladek on her chosen shift or in her chosen role based on any claim of "seniority" (or otherwise). And the Court can fathom no business reason that the Postmaster would opt to affect not only Ms. Sladek's working hours, but also the job assignments and working hours of others. Further, and perhaps more to the point, this Court does not sit as a "superpersonnel department" that is "charged with determining best business practices" in any case. *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010).

Second, Ms. Sladek's argument assumes that there was enough work available on Tour 1 to support a dedicated full-time employee. But the evidence falls short. Ms. Sladek offers affidavits from retired supervisor Eugene Peretti and mail handler equipment operator and union employee Michael Doyle, both of which indicate that after Ms. Sladek was removed from Tour 1: (1) mail flow controllers assigned to Tours 2 and 3 performed mail flow controller work during Tour 1 hours; and (2) Doyle and

fellow mail handler equipment operator Maria Marado Slaughter also performed mail flow controller work on Tour 1. R. 42 at 23, 26. But Ms. Sladek offers nothing to refute the evidence that the work performed by Tour 2 and 3 mail flow controllers was "spillover" work generated (but not finished) during their assigned shifts. And the Postmaster's records do not reflect that Doyle and/or Slaughter ever performed mail flow controller work during the relevant period—let alone during Tour 1. *See* R. 43 ¶ 3 (Smith affidavit indicating that "neither employee worked as a mail flow controller" from April 2010 through August 2010). Even if they did, the record is silent as to the race or color of either of them.[3]

Ms. Sladek also points out that an employee who was subject to a reduction in force at a different USPS facility was placed in a Tour 1 mail flow controller position during the relevant period. R. 40 at 2. But the record indicates that: (1) the employee was not placed in that role until August 2010; (2) even then he did not actually perform mail flow controller duties; and (3) neither Ms. Evans nor Mr. Smith was responsible for that placement in any case. *See* R. 35-1, Ex. 2 ¶ 12 (Melvin Smith's declaration indicating that Mr. Jones "was on the workroom floor working in the Surface Transportation Center (STC) operations which did not require a mail flow controller"); *id.*, Ex. 3 at 3 (Ms. Evans' EEO investigative affidavit indicating that the

---

[3] USPS also argues that Doyle and Slaughter are not proper comparators because they held different positions than Sladek. But an employee with another job title can be a comparator if he or she performed the same duties. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007) (individuals with different job title were similarly situated to plaintiff because they did the same work, with the same output, on the same shift). So this is not a basis to grant USPS's motion.

decision to reassign mail flow controllers affected by the reduction in force was "made at a [sic] executive level").

Next, Ms. Sladek argues that she should have been allowed to work in another capacity on Tour 1, and specifically complains that she was not selected for a supervisor role. But unlike Ms. Sladek, those employees who were selected already held supervisor positions. *See* R. 35-1 at 89-90. And that a supervisor was needed on Tour 1 does not mean that a mail flow controller was too.

Finally, Ms. Sladek points to certain comments she heard Ms. Evans make. First, she attests that she overheard Ms. Evans telling someone after requesting to leave early to care for a dying friend how "she couldn't stand this employee" who "made her sick" and that there was "no way" she would allow the employee to leave, and "she didn't care what was happening." R. 40 at 3. But there is nothing to tie these comments to Ms. Sladek's race or color. Nor is taking an employment action because of a personal issue unlawful.

Second, Ms. Sladek represents that she overheard Ms. Evans at some undisclosed time tell a co-worker that an individual was "good looking even if he is white." R. 39 at 6. But even construing this comment as generously as possible—and setting aside for the moment that it was not substantiated by an affidavit or other evidence—it at most amounts to a stray remark that cannot establish pretext. *See Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 781-82 (7th Cir. 2007) ("stray remarks that are neither proximate nor related to the employment decision [at issue] are insufficient to defeat summary judgment"); *Merillat v. Metal Spinners, Inc.*, 470

F.3d 685, 694 (7th Cir. 2006) ("isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus"). Ms. Sladek's claims therefore fail under *McDonnell Douglas*.

### B. *Ortiz*

Ms. Sladek's claims fare no better under *Ortiz*. Indeed, the only mention of race or color in the record is the stray remark recounted above, and the fact that Ms. Sladek was the only white mail flow controller at the time. Ms. Sladek herself acknowledges that she "can't say that Evans . . . was punitive with [her] because [she is] white." R. 39 at 6. Accordingly, summary judgment is proper on Ms. Sladek's race and color discrimination claims.

## III.    Constructive Discharge

Ms. Sladek's constructive discharge claim likewise fails. An employer constructively discharges an employee only by making the employee's "working conditions so intolerable that the employee is forced into an involuntary resignation." *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir. 1986) (emphasis omitted). That standard is very high; indeed, "working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment," because "an employee is expected to remain employed while seeking redress." *Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006). Moreover, "to be actionable . . . the work conditions need to be more than merely intolerable—they need to be intolerable in a discriminatory way." *Chambers v. Am. Trans Air, Inc.*, 17

F.3d 998, 1005 (7th Cir. 1994). As explained, there is no evidence that Ms. Sladek was removed from Tour 1 because of her race or color. Summary judgment is proper on Ms. Sladek's constructive discharge claim for this reason alone.

## Conclusion

The Court sympathizes with Ms. Sladek over the personal circumstances that led her to retire several months earlier than planned. But whether considered under *McDonnell Douglas* or "cumulatively" under *Ortiz*, there is not enough evidence from which a reasonable jury could conclude that Ms. Sladek's working hours were changed and/or that she was constructively discharged because of her race or color. Accordingly, the Postmaster's motion for summary judgment, R. 32, is granted, and this civil case is terminated.

ENTERED:

_Thomas M Durkin_

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: July 20, 2021

17